The next case on the call is case numbers 122798 and 122813, County of Will v. Illinois Pollution Control Board, agenda number 9. Counsel, I see you have agreed to split your time ten minutes each on opening remarks. The clerk will give you a three minute warning, I believe. If you go over, it will be deducted from the next person to speak. Ms. Cech, you may proceed. Thank you. Good morning, and may it please the Court. I am Marie Quinlivan-Cech on behalf of Will County and the Will County Land Use. The Illinois Pollution Control Board is tasked with protecting the water, the groundwater, in the state of Illinois. The only way to protect the groundwater is to monitor the groundwater. They have concluded, without any basis whatsoever, that there is no harm to the groundwater from the CCD and USF fill sites. But there is absolutely no basis for that conclusion. This would be like a doctor taking care of a patient without doing an examination. He hasn't looked at the patient. They haven't looked at the water. There's no way to verify that the groundwater is, in fact, fine. And there's evidence to suggest that the groundwater is not fine at these sites. At the CCD and USF sites, there was a study where 10 of 12 sites showed contamination of the dirt. This is very important. In Will County, there are nine quarries. These are huge excavations, and the fill is going down well below the water table. This means that the fill is sitting right in the water table. The dirt is coming up dirty. The dirt is showing contamination. If the dirt that is sitting in the water table is contaminated, it's certainly worthy of a look to see if the water itself is still clean. The proposal by Will County is a very simple one, and it's confined to looking at the condition of the water right at these fill sites. The proposal by Will County is to set a well up gradient and test the water before it goes through the fill site, and then set three more wells down gradient and test the water after it has gone through the fill site. This is a way to determine what impact the fill and the fill site, the CCD, the USF, has on the quality of the water. It's not a comprehensive look, although I would argue that the board has a duty to protect the water everywhere. But what we're talking about here is that there's a way to tell whether or not the CCD and USF has an impact on the water and the groundwater at these fill sites. Could you propose an amendment to the groundwater rules that the board has already adopted, as the board has indicated? They imposed front-end testing, yes, but they rejected subpart G, which was about the groundwater testing. You have proposed an amendment? I'm sorry. What we have is the subpart G that is still in front of the board, and that's the proposal that the board has considered and has rejected. And, again, it's our position that they've rejected without looking at, most important, the only relevant issue. And that's your answer to the board's claim that if you believe a comprehensive groundwater monitoring program is necessary, you could propose an amendment? Well, what they're arguing is that subpart G is designed to address only the impact that the CCD and USF sites, and our position is that our proposal does address exactly that. I think, so irrespective of that, like independently of that, the board's duty is to protect the water, and I believe that it's their duty to protect the water everywhere. But what I'm contesting only here is that our proposal does address only what needs to happen at the CCD and USF sites. Counsel, this is an administrative review proceeding, and so we're not supposed to substitute our decision-making for that of the board. And isn't the standard that the decision has to be arbitrary and capricious? Yes, ma'am. And did the board take testimony? Yes, ma'am. And you would agree that if they reached a conclusion that you might not like, that doesn't mean it's arbitrary and capricious. Is that correct? Our position is that we're going on the third prong of what establishes arbitrary and capricious, that it runs counter to the evidence and is an implausible conclusion that reasonable minds cannot dispute. They don't have evidence. They've reached a conclusion based on no evidence. Without any evidence, they've said, oh, the water is fine. We have protected the water. So, again, like a doctor who hasn't examined a patient, they've concluded without ever looking at the water that they've done their job. There's no way to verify that the water is fine. And, again, there are indications that the water is not fine. There are indications that the water is contaminated. They have a duty at that point to go forward and actually monitor the water. And was that all before the board? Yes, it was. Thank you. There's some discussion about the cost, and industry and the board are concerned about the cost of remediation. Industry was very concerned about the cost of remediation. That's not on the board. It's not on the table yet. We're just talking about the cost of monitoring the water. We don't know that remediation is needed. They have anticipated a problem that is not yet before the board and is not before this court. The cost is only the cost of monitoring the water. There are proposals or there are different suggestions about what that cost might be. Will County's estimate is that the cost could be as little as 6 cents to 16 cents per cubic yard. It's a very modest cost to protect the groundwater, which is essential to the health of everyone in the state of Illinois and in Will County where 71 percent of the population relies on the groundwater for their potable drinking supply. Just to be clear on your argument, we all agree that the standard of review here is whether or not the board's decision was arbitrary and capricious. Correct? Yes. And it's been both sides cite cases that sort of set out some factors for the court to determine, this court to determine whether or not the decision was arbitrary and capricious. And there are three factors, three prongs to that test that have been articulated. Are you saying that you're not arguing one or two, you're only relying on the third prong that a decision is arbitrary and capricious because it offers explanation for its decision, meaning the board, that run counter to the evidence and are so implausible that they could not be ascribed to a difference in view or the product of the board's expertise. Is that what you're arguing? That is our primary argument. But we would also argue that they failed to consider an important aspect of the problem in that they failed to look at the water. And we would also argue that they failed to consider an important aspect of the problem because by not looking at the water, they failed to look at the most critical aspect of the problem. So we're relying on two and three under the arbitrary and capricious. But not one. Correct. Thank you. My last point, then, is the board also considered or failed to consider the potential cost of not monitoring the water. They didn't look at the water. They are not looking at what the potential would be for not monitoring the water. And that could be very extensive. If there is a problem, the sooner we know about the problem, the sooner we address it, the sooner we take care of it, the better off we are going to be. So in conclusion, then, Will County's position is that the board decision was arbitrary and capricious, that they failed to consider the most critical aspect of the problem. They failed to look at the water. There's no way to protect the water, no way to be sure the water is clean, unless they actually monitor the water itself. Thank you. Thank you. Good morning, Your Honors. I'm Illinois System Attorney General Carl Elitz, representing the people. This court should reverse the appellate court's judgment in this case and remand the matter back to the board. The board's statutory charge under Section 2251 and 2251A of the Act is to promulgate final rules that protect groundwater. The final rules promulgated by the board don't do that. The board's rules fail this standard because they omit any sort of groundwater monitoring at clean construction or demolition debris sites or uncontaminated soil fill sites. The failure is arbitrary and capricious because the board's decision relied on factors that the General Assembly did not intend for it to consider. The decision fails to appreciate important aspects of the groundwater problem, and the decision offers an explanation that runs counter to the evidence, is implausible, and cannot be ascribed to a difference of opinion or an application of the board's particular expertise. So, Mr. Elitz, you are arguing all three factors, is that correct? I am, yes. I really don't understand that first argument, and I'm going to ask you to help me understand. I understand what happened here is the board looked at the statute, the statute defining what a CCDD and a USF is, and that those are materials that are not contaminated. And then the boards made a determination that there was no evidence in the record that non-contaminated material could, in fact, contaminate water. So, therefore, they made a choice to strengthen the regulations to ensure that the material that is brought in is not contaminated. Certainly, those seem to be factors that the statute itself is dealing with. In other words, what's contaminated and what is not. The argument that you raised in your brief is that the misstep of the board that makes their decision arbitrary is that they focused on the point of whether CCDD and USF should not be treated as waste. I'm not sure I understand your argument. The film material does contain contaminants, despite the fact that it's designated clean and uncontaminated soil film. It contains contaminants for many reasons. One is because there's just a certain amount of material that gets through the front end shacks, but there's also material in this debris, which is low levels of all the types of contaminants that people worry about in groundwater. So that's not how the statute is constructed, though, right? The statute defines what's taken into one of these fills to be material that is not contaminated. That's what's defined. It's defined as uncontaminated soil fill, and it's defined as clean construction and demolition debris. That does not mean that the material doesn't contain some contaminants. Yes, that's true. The board's own final rules set out a list of contaminants and the levels to which those contaminants can exist in the material without going afoul of the placement. So obviously the board's own rules recognize that things like lead and even things like arsenic and DDT can be in this soil in low levels. And the law will still treat it as uncontaminated, even though there are contaminants in the water or in the soil. So the board looked at the statute, and you're saying the statute doesn't really reflect the reality of this kind of material. That's well put. Even though it's defined as non-contaminated, it really is, and everybody seems to understand that. That's well put. So why, if the fact that the board engaged this problem, that the statute says that it's not contaminated, and you're saying it is contaminated, why does that make your decision arbitrary? Because their own rules recognize that the fill can contain contaminants in low levels. And after the hearings, we had testimony, and it was almost universal, that in inappropriate conditions, if this material, the uncontaminated fill, which has low levels of contaminants, if it's put in acidic water, for example, it can release those contaminants. They can migrate. They can disperse, or they can concentrate. Our time is short. Where in the record are you saying that the board should not have relied on the definition of waste and should not have relied on the definition of waste? In the final decision that was issued by the board, they said that one of the motivating factors for the rule not having groundwater monitoring is that they didn't want to overstep the General Assembly's decision that this material was not waste. And so how is that failing to consider, relying on factors that the General Assembly did not intend for the board to consider? Because waste was not the General Assembly's concern when it amended the statute and it provided that groundwater at these facilities, at facilities that accept uncontaminated soil fill and facilities that take clean construction demolition debris, the act was amended to require a final rule that protects groundwater at these sites. Of course, if you say, well, there's no contamination here by definition, then there's no need for a final rule. Well, that's actually saying to the General Assembly, we know you've passed a statute that requires us to protect groundwater, but we don't even see a problem. And, in fact, the board's brief pretty much does exactly that. I just realized the board claims that you're attempting to shoehorn a rule to protect groundwater from historical contamination into a rule to protect groundwater from potential contamination from CCDD and USF. I do argue that fill that was placed in the ground for the board's final rules that has never been checked by any operator under the board's rules, it's just been put into the ground, that material is part of the legislative mandate that the board has to protect groundwater. That is a major dispute between the people's position and the board's position. We believe that the material that was placed prior to even the requirements that there be front-end checks put in place, before that, that material is still in the ground. That material under the statute is still being used as fill because it's used as fill until it's covered. And that material poses a risk. That material poses a risk because when that material comes in contact with acidic water, that material can release the contaminants that are in the non-contaminated material. And we don't know what's happening with those materials, and that's the point that this check makes. We have to figure out what's going on with the water that's in the facilities. The board's argument is that we'll check all the materials coming in, and therefore we'll make sure that everything coming in is clean. That can't be right because material's been coming into these facilities since 1997. It's still being used because it hasn't been covered. So there's still an obligation to protect groundwater. And when the General Assembly promulgated a statute that required a final rule that protects groundwater, they didn't insert an exception for materials that had been placed prior. The statute's clear that what happens is the material gets placed, the material's used, and the material's covered. That's the lifespan of this material. And we're arguing that the fill that's been placed prior to the final rules that weren't really final until 2012 can't protect the groundwater because that material's in the ground. The board's rules recognize that uncontaminated fill and clean demolition debris, when it comes in contact with acidic water, can release things that are in the materials, arsenic, lead, all the other horribles that are in the board's final rules. These are all things that the soil needs to be tested for going forward. All that material was placed without testing for over 12, 15 years. And testing the soil doesn't really help us know what's going on with the groundwater. Even if the soil is all clean, this material is placed in the water table, below where the water's flowing. So it can interact with what are generally small amounts of material, and that can become a problem over time. Without anything in the final rules governing that material, we're just not protecting groundwater. We're just ignoring what is a perceived risk. And the EPA is the ones that had proposed this rule. The EPA had promulgated, had recommended a rule that was fairly favorable to industry, would allow the industry to place the wells where they felt it was best for their sites. The information gathered from the testing was not something of public record. It was only delivered to the operators so that they could monitor the conditions of the groundwater at their site. Without monitoring of this water, it's simply just not protected. And the statutes, Section 11B of the Act, directs the board to protect the groundwater from contamination, not from waste or pollution, or from waste. So we are concerned about historic fill. We're also concerned about fill that is being brought through the gates of these facilities that is showing up as Ms. Cech said, dirty in the testing. We've had random tests showing that material is getting past the certificate process. It's getting past the screening process. It's at the sites. The board argues that there hasn't been any examples of groundwater being contaminated. Despite the fact that the soil has gotten past the front gates and is in the ground, there hasn't been groundwater protection. I would just disagree and say that you've got a good example of groundwater protection at the Linwood site where 99% of the material deposited there was CCDD, Clean Construction Demolition Debris. And yet one of the wells there produced information that there was arsenic, lead, manganese, boron, and eight VOCs, which are cancer-causing elements of the material. That was all found at the Linwood site where the material was 99.99% CCDD. So we have an example of at least one facility where not only the soil has been contaminated, but the water itself has been contaminated. I want to just touch on briefly the board. I don't have time, so I'll just talk about borrow pits if I have a chance on rebuttal. We'd ask that the court reverse the appellate court's decision and remand this case to the board for further receiving. Thank you, Your Honor. Thank you. Ms. Tipser. Good morning. May it please the court, counsel. My name is Marie Tipser. I'm an attorney with the Illinois Pollution Control Board, and with me today is Jonathan Mark Powell, also an attorney with the Pollution Control Board. We've both been appointed special assistant attorney generals to argue this case before this court. I want to first address a couple of arguments that were made. First of all, Mr. Ellis' argument concerning the use of CCDD and uncontaminated soil fill, that it's still being used in the fill, and I would point out that for the first time in reply, the people raised that argument. They did not prior to the reply raise that argument that the fill is still being used. So I would argue that they've waived that argument. But I would like to address it and say that the statutes have a prospective application unless they specifically state otherwise. The board looked at sections 22.51 and 22.51A and determined that we were to protect against the use of CCDD and uncontaminated soil fill as it came into facilities and protect groundwater from the use of CCDD and uncontaminated soil fill. The board examined that, and this rulemaking was all developed in the context of that. I also note that Mr. Ellis talked a little bit about acidic water and things like that. I would note that part of the areas where the board made the front end screening more stringent than what was proposed by the IEPA was to require that all soils be tested for pH and that max, which are the maximum allowable concentrations, which I believe is the contamination that Mr. Ellis is talking about, are numbers that are used throughout the state for cleanup, not just for landfills, not just for CCDD and uncontaminated soil fill sites, but for underground storage tanks. For any type of cleanup, you determine what is the maximum allowable concentration. Those were developed in a substantial rulemaking under Part 741 and 742. I believe those are the correct numbers. And in those rulemakings, it was determined that these were the concentrations that could exist in soil and still be protective of public health and the environment. And as for Will County's argument about a proposal, perhaps it's because as an administrative person, to me, a rulemaking proposal is a proposal brought to the board and said, here, board, adopt this rule. When she speaks about Will County's proposal for one up gradient and three down gradient, I'm not aware that Will County ever proposed a rulemaking or an amendment to the board. I was the hearing officer in the proceeding, and I don't recall them doing that. And if it's in the record, I apologize and would certainly be willing to be made wrong. But I don't recall them ever proposing anything except to talk about subpart G, which was proposed by IEPA. The board looked at Sections 22.51 and 22.51A, and not one, not two, but three substantive opinions looked at the issue of not only groundwater monitoring but other issues surrounding CCPD and uncontaminated soil fill sites. And, Justice Heiss, as you noted, the board placed a huge emphasis on ensuring that materials meet the definition that the legislature gave the board of clean and uncontaminated. And while they talk about the fact that, you know, we don't know what's in the groundwater, we don't know what's in the groundwater. But we do know that at facilities that are regulated under Part 1100, like Reliable Lions, dewatering shows in the NPDS permit that there is no exceedances of Class I groundwater standards. We also have evidence from Mr. Huff that he spoke about a facility where there was no evidence of Class I groundwater standards. Add to that the cost for groundwater monitoring, while Will County alleges it's reasonable, we have plenty of testimony from people who, in industry, could discuss how much it would cost to do groundwater monitoring. The fear from municipalities that the cost of groundwater monitoring could force CCPD and uncontaminated soil fills to close, resulting in the need to take material instead to a CCPD to a landfill at a substantially larger cost to municipalities. The board not only looked at Section 22.51 and what was part of the proposal, but we also looked, when J. Carr asked us to take yet another look, after going to first notice, J. Carr came back, and after second notice, J. Carr said, look at groundwater monitoring one more time. And the board looked at groundwater monitoring one more time. We held hearings. We took in public comment. We asked questions after the hearing of the participants seeking information. The board then applied its technical expertise and determined that they made the right decision under Part 1100 all along to ensure that the materials that entered into the facilities met the definition provided by the General Assembly of clean and uncontaminated, such that it would then protect the environment and protect groundwater and not require cost of groundwater monitoring problems. The subpart G was rife with problems. Both Will County and Carr had great concerns about the fact that the IEPA's proposal was self-implementing. Industry had concerns about what constituents would need to be monitored. They also had concerns about the cost of groundwater monitoring. The people, in fact, argued that CCBD and uncontaminated soil fill sites should be treated as inert waste landfills. So in the very beginning, and I believe it was public comment 15, the people started raising the issue that we should treat this as waste. The board considered the entirety of the record and determined that groundwater monitoring for regulated CCBD and uncontaminated soil fill was not necessary to protect groundwater because front-end screening, soil certification, and these enhanced requirements that the board added before eliminating subpart G were sufficient to protect against groundwater. The reality is this record shows no evidence that a properly run facility has contaminated groundwater. And in fact, the Attorney General's own witness agrees that the only evidence of groundwater contamination at one of these types of facilities is the Linwood facility, which you are very aware of hearing this court. But the Linwood facility was never regulated under Part 1100. It was never regulated under the statute. It's a facility that was taking in material, and it was filled above grade, which under the law, CCBD and uncontaminated soil fills can't be filled above grade. So using Linwood as an example of why we need groundwater monitoring is, well, a little confusing considering the evidence we have for places like Reliable Alliance that does dewatering and shows no evidence of contamination in its dewatering and other facilities that we've heard from from Mr. Huck. Mr. Elitz commented on how there was fill that wasn't tested prior to the testing. How do you address his argument on that? The fill that is already in place is fill that's in place, and it's the section 22.51 and 22.51A, which were the amendments to the sections that required the board to consider protection of groundwater. It would be a retroactive application to suddenly say, well, you have to start protecting or dig that fill up or any of those things. We looked at what's coming into them now. But the evidence also shows that even the... So that wouldn't come under the general groundwater protection mandate then? It does, but again, that's not what this rulemaking was. This rulemaking was under section 22.51 and 22.51A. And certainly if someone wants to come in and say, here's evidence or here's concerns and here's a monitoring program we believe that should be placed throughout the state, the board would look at that as part of the groundwater protection act. And we would look at it as part of the environmental protection act. But this rulemaking was implementing sections 22.51 and 22.51A. And that's what the board examined. The only proposal before the board was to address the fill that was coming into the facility under part 1100. So we didn't have a proposal before us that would address the issues. And in fact, the proposal that was before the board would not even address the material that's already in those facilities if a facility decided to close. Subpart G allowed for no groundwater monitoring if you closed within one year of adoption of the rule. So again, the Linwood site would never have been subject to groundwater monitoring even under these rules. And any facility that might have disobeyed or scoffed laws or had concerns, and that was one of the reasons the municipalities were concerned, if you had any concern that you might have contaminated material, you would simply close and never be required to do groundwater monitoring. So your answer to them is basically propose an amendment. Yes, absolutely. Which we would absolutely consider. But it's not what this rule was about. And it's not even, I mean, they talked about it, but no one actually even came in and said, here's a proposal. We had subpart G before the board. That's what the board was considering. The board didn't fail to consider important aspects of the problem. Again, we've developed more stringent front-end load requirements. We looked at sites that wouldn't have to perform groundwater monitoring, those that closed within one year. And we did look to borrow pits as an example of where the General Assembly was willing to let IDOT determine whether or not the fill was okay going into borrow pits. And while I would agree that borrow pits were not the same size as a quarry, the fact of the matter is that the board could certainly look to the borrow pits and the fact that IDOT was willing to put on screening requirements very similar to the ones the board adopted in Part 1100 to say, okay, it's fine to put that material here. But by no means is that the only thing that CCDD and uncontaminated soil fills regulated under Part 1100 are subject to. They're subject to being registered, permitting, EPA inspections, record keeping. So we don't say just borrow pits and say, oh, well, because borrow pits and quarries are the same, they're the same. They're not. We recognize there's a difference. But we can certainly look at it as persuasive that borrow pits would not have to monitor for groundwater. And that was a statutory definition, not one in the rule itself. We did look at cost of groundwater monitoring. We have conflicting evidence in the record, as I just pointed out. Will County says it's reasonable. Industry disagrees. Municipalities have great concerns about what the cost of groundwater monitoring and the impact that it might have on the state if these facilities had to start closing. We also looked at the history of noncompliance and the idea that there are people out there that don't comply and determined that this rulemaking is not the place to address noncompliance. Noncompliance is an enforcement action under Title VII of the Act. And the reliance that Will County and the people make, and they sort of refer to here on data regarding soil sampling and load checking that occurred after Part 1100, those are simply misplaced. First of all, if something comes to the facility and the load checking determines that it exceeds the standards and therefore the certification didn't work, that load is rejected. That load doesn't go into the facility without further testing and further examination. So that load is rejected. So the fact that something comes to the facility and gets rejected shows the front-end screening and the requirements the board put on with the checks and balances work. And as far as the details that there are exceedances of metals and mats in the soils, yes, there are, but the IEPA's own witness admitted that, yeah, we've got this information, but we don't really think it's a good indicator of whether or not there's groundwater contamination. We would have had to take yet another test and another step, and we did not take that step. The board's explanation for its decision is well-founded in, again, three substantial opinions and orders, and one opinion and order solely addressing groundwater monitoring. We note that Linwood was never regulated, ever. We note that there's a lack of evidence in the record, and the evidence we do have from sites that are regulated show that there is no contamination coming from the waters that are in contact with CCDD. Linwood would never have been required to do groundwater monitoring under this proposal. And I think that's all I have, unless you have any additional questions. You talked about a load being rejected. Does every single load get tested? Not every single load gets tested when it comes to the site, but the people there at the site are trained to observe them, and they do random testing. For example, though, before it even gets to the site, there is obviously a licensed professional engineer or a licensed professional geologist maybe signing off on a load. So there are random checks, and it's obviously in the best interest of the facility to keep bad loads out. But every single load is not tested? No, it's random testing. Okay. And did subpart G include any requirement for back-end testing? No. No. No. And, in fact, one of the points made in the dissent at the appellate court was that one of the members of industry testified that if the board decided to do groundwater monitoring, and I emphasize if because he emphasized if, that we could look and maybe develop a baseline. And IEPA itself had a concern about using a baseline, because if you develop a baseline, then you could actually be leaving contamination in place if you establish a baseline where the baseline already exceeds groundwater standards. So IEPA actually opposed that concept. So, no, IEPA, and that was actually one of the problems with the IEPA's original proposal, was how do we determine if it's coming from the landfill? Or, I'm sorry, from the CCDD or uncontaminated soil fill site. How do we make that determination? Do we test up gradient? Do we test down gradient? How do we know that the fill owner is responsible for the contamination? I urge this court to affirm the appellate court's decision, affirming the board's decision, as the board's decision was not arbitrary, capricious, or unreasonable. Thank you very much. Thank you. Thank you. Mr. Eilitsch. Thank you, Your Honors. I just don't agree with some of the things that I think Ms. Tipsore just said. Most of the materials coming to these fill sites have not been tested by a professional engineer or a geologist. This material is certified by originators. If they certify that it's not from a potentially impacted site, that's all the certification they need to do to load the truck and send it to a fill. Once it gets to the facility, they're visually inspected, and there's a device called a PID which checks for one type of contamination, volatile organic compounds. The record is that since the Part 1100 rules in one year, I believe, there was over 400 load rejections, and more than 200 of these were for PID readings. So we know that the material being sent to the facilities is violating the standards with regard to the PID readings, but for much of the material contaminations we're concerned about, there is no PID test. So the material is self-certified by originators. It shows up at the facility. It's looked at visually. A PID reading is run, and those PID readings are showing a substantial amount of materials contaminated or rejected, but there is no testing, for example, for metals. So if there's metals in the material... The regime that you're discussing here are the standards after this amendment where there are these front-loaded conditions were added. Yes. So we know that even the front-looking procedures that are protective of groundwater, according to the board, are not working. We know this also because when soil is tested at the facilities, it's coming up as violating the MACs. We had 12 samples were taken by EPA. Ten of them failed. The board is saying, well, we don't know that that gets into the groundwater. Well, witnesses testified that if it gets into the facility, and we all know how water works, it tends to draw things down into the ground, that it's going to eventually reach the groundwater. EPA said that that was almost certain, the materials that are contaminated. So not only are we talking about the historic materials, where I think Ms. Tipsworth and I have the biggest disagreement, because it's my view that the Illinois law protects groundwater from historic contamination as well at these facilities, not just material that is placed going forward. In the proposal that was presented to the board, did that proposal look to remediation of prior fail? No. The proposal, the subpart G proposals that were rejected, that EPA had proposed to the board, were just about securing information about what the groundwater was doing. It was not about liability. The industry, one of the industry witnesses, too, said that there was a concern that facilities would decide to close rather than implement the tests, and some probably would. But that's really not the point of the rules. The rules were not designed to close sites. The rules were just designed to find out what was in the groundwater, because without information about what's in the groundwater, you can't protect it. Let's be careful. Did the proposal, is that specifically what the proposal said? Yes. That the board should order that groundwater be tested. Is that the proposal? Yes. The groundwater, actually, the testing is a little bit incorrect. It's monitoring. So the wells would be dug, and they would be permanent fixtures to the facility. And then annually what would happen is the water would be pulled up and checked and tested. And so we'd get baselines of what's going on in the ground. If arsenic is falling, if it's rising, if lead is falling, if it's rising, if there's more DDT or less DDT, all this information would come from the testing. We'd know then what's going on with the groundwater. And that's important, because without knowing what's in the groundwater, we can't really say that the groundwater is protected. The General Assembly didn't amend Section 2251 to protect groundwater from things that don't exist. I mean, there was a concern by the General Assembly that groundwater needed some sort of protection. The board has taken a proposal, which had front-looking screening and back-looking screening, and decided the back-looking screening was not necessary and strengthened the front-looking screening. It's as if they had a house, and they said, let's take the lock off the back door and we'll put it on the front door. That'll make the house more secure. Really, all that's done is it's opened up the back door to the possibility of having a breach of the facility. And that's what's going on here. Without any sort of background check on the water, there is no protection of groundwater. That's essential. That was the proposal the board had before it. When it got to JCAR, JCAR looked at it and said, rethink this decision to strike the groundwater monitoring. The board took a look at it and said, we're going to leave it as it stands. So that's how we ended up with the rules that we have now. But EPA, the people, certainly Will County, that has a lot of these facilities, and is very concerned because their drinking water is often based on groundwater extraction. All of these witnesses were very concerned about groundwater protection, and the only argument that was given against it was that it could close facilities and be bad for industry to close facilities. That may be true. We just don't know, though. And without testing, we'll never know. So without groundwater monitoring, there is no protection of groundwater. Just to make the point, borrow pits were mentioned. The board had referenced the fact that there are IDOT borrow pits. They're seasonal. They're small. They're related to road construction, and they're supervised under IDOT. That's just not what a quarry or a mine excavation is. These facilities are there for years or decades. It's the amount of material and the time that water is covering this material that is a concern to the witnesses about contamination. We need a rule that somehow measures groundwater so that it can be checked and you can thereby know that the groundwater is safe. Without it, we just don't know, and that seems to be industry's preferred situation, and that's not what the General Assembly intended in amending the act. So I'd ask the court to reverse the appellate court's decision on amending the act. Mr. Eelitz, is there any reference to back-end groundwater monitoring in Subpart G? I mean, I thought I had read that somewhere. Subpart G is the groundwater monitoring back-end provision that was struck from the woods. Well, maybe I didn't ask the question right, or maybe I didn't understand Ms. Tipsford's answer, but I thought she said there wasn't back-end in Subpart G. I didn't understand that answer. Subpart G, as I understand it, was part of the package of the rules that was proposed by EPA. Subpart G was the back-end groundwater monitoring provisions that were stripped out of the rules, went to JCAR. JCAR said reconsider it. The board reconsidered it, and it just remained out of the rules. So we have a final rule now that is supposed to protect groundwater but doesn't test groundwater. So, Your Honors, thank you. We'd ask to reverse the appellate court to amend the case of the board. Thank you. Thank you. The case number is 122798 and 122813. The County of Willamette, North Carolina Ocean Control Board will be taken under advisement as agenda number nine. Ms. Check, Mr. Helitz, Ms. Tipsford, we thank you for your arguments this morning. You are excused.